**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-01227-NYW-STV

J.T., on behalf of her minor child, A.R.,

      Plaintiff,

v.

DENVER PUBLIC SCHOOLS,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's First Amended Complaint [Doc. 17] and Plaintiff's Amended Opening Brief ("Opening Brief") [Doc. 30]. Plaintiff J.T. appeals the decision of the State of Colorado, Office of Administrative Courts, wherein the administrative law judge ("ALJ") concluded that Defendant Denver Public Schools ("Defendant" or the "School District") did not violate the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* For the reasons that follow, the decision of the ALJ is respectfully **AFFIRMED**.

## BACKGROUND

### I.    The Individuals with Disabilities Education Act

The IDEA "ensures that children with disabilities receive needed special education services." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017). Among other things, the IDEA requires "states that accept federal special education funds to provide disabled children with a 'free appropriate public education' ('FAPE') in the 'least restrictive environment.'" *Ellenberg v. N.M. Mil. Inst.*, 478 F.3d 1262, 1267 (10th Cir. 2007). A FAPE, which is the "central pillar of

the IDEA statutory structure," *Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008), is defined as

> special education and related services that –
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). "A school district satisfies its obligation to provide a FAPE to a disabled child 'by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" *Jefferson Cnty. Sch. Dist. R-1 v. Elizabeth E. ex rel. Roxanne B.*, 798 F. Supp. 2d 1177, 1180 (D. Colo. 2011) (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982)), *aff'd*, 702 F.3d 1227 (10th Cir. 2012).

The IDEA's central mechanism to ensure that all eligible children receive a FAPE is its requirement that the state create an individualized education program ("IEP") for each eligible student. *Patrick G. by & through Stephanie G. v. Harrison Sch. Dist. No. 2*, 40 F.4th 1186, 1190 (10th Cir. 2022); *see also* 20 U.S.C. § 1401(14). An IEP "is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1236 (10th Cir. 2009) (quoting *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993)); *see also Ellenberg*, 478 F.3d at 1268 (explaining that an IEP is typically "[p]repared

at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child").

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).  If the student is "fully integrated in the regular classroom," the child's IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 401; *see also Rowley*, 458 U.S. at 204.  If the child is not fully integrated into the general education setting, the student's IEP "must be appropriately ambitious in light of [her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Endrew F.*, 580 U.S. at 402.

The Supreme Court has recognized that "crafting an appropriate program of education requires a prospective judgment by school officials," and "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 399.  In *Endrew F.*, the Supreme Court declined to "attempt to elaborate on what 'appropriate' progress will look like from case to case," as "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 403–04.  The Supreme Court cautioned that courts are not to substitute their judgment for the expertise of school officials:

> [D]eference is based on the application of expertise and the exercise of judgment by school authorities.  The [IDEA] vests these officials with responsibility for decisions of critical importance to the life of a disabled child.  The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue.  By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement.  A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive

> explanation for their decisions that shows the IEP is reasonably calculated to enable
> the child to make progress appropriate in light of his circumstances.

*Id.* at 404 (citations omitted).  "Th[e] absence of a bright-line rule . . . should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'"  *Id.* (quoting *Rowley*, 458 U.S. at 206).

"If a child's parents and school cannot agree on an IEP, the IDEA establishes formal procedures for resolving the disagreement."  *Elizabeth B. by & through Donald B. v. El Paso Cnty. Sch. Dist. 11*, No. 16-cv-02036-RBJ-NYW, 2019 WL 3774119, at *5 (D. Colo. Aug. 12, 2019), *aff'd*, 841 F. App'x 40 (10th Cir. 2020).  Parents who believe a school is violating the IDEA may file a due process complaint with their state educational agency alleging a violation of the IDEA.  20 U.S.C. § 1415(b)(6).  If the matter is not resolved within 30 days, the parents are entitled to a due process hearing, after which a hearing officer will issue a "determination of whether the child received a free appropriate public education."  20 U.S.C. § 1415(f)(1), (3)(E).  If the parents remain unsatisfied with the outcome of the hearing, they may appeal the administrative decision in state or federal court.  20 U.S.C. § 1415(i)(2).[1]

---

[1] In addition to alleging a substantive violation of the IDEA, parents may also allege that a school failed to comply with the IDEA's procedural safeguards, if the procedural inadequacies impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process, or caused a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E).  While J.T.'s Amended Complaint could be construed to allege a procedural violation of the IDEA, *see, e.g.*, [Doc. 17 at ¶ 38], J.T. raises no argument about procedural violations in her Opening Brief.  *See* [Doc. 30].  Thus, any argument that the School District committed a procedural violation of the IDEA has been waived.  *See Patrick G.*, 40 F.4th at 1205 n.8; *G.W. v. Boulder Valley Sch. Dist.*, No. 16-cv-00374-PAB-SKC, 2019 WL 4464130, at *19 (D. Colo. Sept. 18, 2019).

## II.     Factual Background[2]

A.R. was born in 2010.  [R. at 484].[3]   At all relevant times, A.R. was educated by the School District.  [*Id.*].  In May 2015,[4] A.R. was evaluated for special education and deemed eligible for an IEP based on a "developmental delay."  [R. at 699, 703].  A.R. continued to qualify for special education after subsequent evaluations in May 2017 and March 2019.  [R. at 703–04].

*Second Grade*.  In May 2017, A.R. was again evaluated by the School District.  [R. at 494–509].  The report gave A.R. a cognitive score in the below-average range and identified that A.R. struggles in the area of working memory and has decreased focus, attention, and endurance, which "impact her greatly in the general education classroom and in her small group opportunities."  [R. at 508].  A.R.'s academic scores "show[ed] significant deficits in reading and math."  [R. at 509].

A.R. began second grade in 2017 at Ellis Elementary and was given an IEP dated October 26, 2017 (the "2017 IEP").  [R. at 510].  The 2017 IEP describes A.R.'s parents as "very happy" with A.R.'s improvement that past year.  [R. at 515].  The 2017 IEP provided that A.R. was to spend between 40% and 79% of her time in the general education classroom, [R. at 510], and

---

[2] The Court draws these facts from the ALJ's findings of fact, *see* [R. at 484–90], which do not appear to be challenged by either Party.  *See L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004) (stating that the district court must give "due weight" to the ALJ's findings of fact, which are considered prima facie correct).  To the extent that Plaintiff may attempt to challenge the ALJ's findings of fact, the Court discusses this apparent challenge below.

[3] The Administrative Record was conventionally submitted by Plaintiff and has not been filed via the CM/ECF system.  *See* [Doc. 24].  The Court cites to the Administrative Record as "R." followed by the referenced page number.

[4] A due process hearing under the IDEA concerns only matters occurring within the two calendar years prior to the filing of the due process complaint.  *See* 20 U.S.C.A. § 1415(b)(6)(B) (a party may present a complaint "which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint"); *see also* 34 C.F.R. § 300.507(a)(2); 34 C.F.R. § 300.511(e).  Plaintiff filed her Due Process Complaint on June 8, 2020, [R. at 1], and thus, may challenge only acts occurring after June 8, 2018.  The Court includes factual information from before that date for background purposes.

explained that A.R. "[would] benefit from services being provided inside the [general] classroom as they will allow for collaboration between classroom staff and service providers, and will increase peer modeling opportunities."  [R. at 525].  More specifically, A.R. was to spend approximately 48% of her time within the general education classroom and 52% outside of that setting, [*id.*], which amounted to approximately 16.75 weekly hours in the special education setting.  [R. at 524].  The IEP also demonstrates that two other placement options were considered for A.R.: spending at least 80% of her time in the general education classroom and spending less than 40% of her time in the general education classroom.  [R. at 525].  The 2017 IEP explains that these options were rejected because A.R. would benefit both from small group instruction outside of the classroom and peer modeling and interaction with peers.  [*Id.*].

The 2017 IEP listed objectives for A.R.'s progress in reading, mathematics, self-determination, language, and physical motor skills.  [R. at 515–20].  Progress reports throughout A.R.'s second grade year indicate that A.R. met her goals in mathematics, [R. at 529–30], made progress on her goals in self-determination, [R. at 531–32], and made progress on her language and physical motor goals.  [R. at 533–35].  Additionally, A.R. met some of her goals in reading and made progress on others.  [R. at 527–29, 535–37].  J.T. testified at the due process hearing that the beginning of A.R.'s second grade year was "great," but that she believed that A.R. "started going downhill" after the Christmas break due to a change in educators.  [R. at 850:10–24].[5]

***Third Grade***.  A.R. began third grade at Ellis Elementary in the fall of 2018.  [R. at 485, 538, 540].  An IEP, dated October 23, 2018 ("the 2018 IEP"), was developed for A.R.  [R. at 538].  At this time, A.R.'s overall reading grade equivalent was 1.2, i.e., A.R. was "[p]erforming as an

---

[5] When citing to transcripts, the Court cites to the Administrative Record page number, as opposed to the transcript's page number, but cites to the line numbers included in the hearing transcript.

average first grade student who took this test in October" of her first-grade year.  [R. at 542].  The 2018 IEP indicates that A.R. was "[p]erforming seriously below grade level and in need of intensive intervention" in a number of areas; A.R. was evaluated as being in the second percentile in overall reading; the seventh percentile in text fluency; the eighth percentile in vocabulary; the seventh percentile in comprehension; and the second percentile in spelling.  [*Id.*].

The 2018 IEP again proposed that A.R. spend 40 to 79% of her time in the general education classroom, but increased the amount of the time A.R. was to spend in general education to 66% of her time.  [R. at 538, 553].  A.R. was to spend 10.5 hours per week outside of the general education classroom, with additional special services provided monthly.[6]  [R. at 552–53].  J.T. objected to this decision and requested that A.R. spend less time in the general education setting. [R. at 873:12–16].  In response to J.T.'s objection, the School District wrote in A.R.'s IEP:

> It was considered to increase [A.R.]'s time outside of the general classroom to focus on academic skills.  This was rejected because [A.R.] benefits significantly from the behavior and academic model of her peers.  At this time, she has demonstrated growth using the current setting code and would benefit from continued inclusion in the general classroom.  [A.R.] needs to continue to be pulled out of the general education classroom for small group instruction.

[R. at 553].

The 2018 IEP contains various objectives for A.R.'s progress in reading, social and emotional wellness, mathematics, physical motor skills, and language.  [R. at 544–48].  The School District concluded in the 2018 IEP that A.R. was not eligible for an extended school year, i.e., summer school services, concluding that A.R. had not experienced a severe regression on her IEP

---

[6] The ALJ found in his decision that "[t]he time outside of the general education classroom was to total 16 1/2 hours per week."  [R. at 485].  The Court does not accept this finding of fact, as it is not supported by the 2018 IEP.  Some of the special services included in the ALJ's total were to be provided monthly, rather than weekly.  *See* [R. at 552].

goals and objectives and did not require "an unreasonably long period of time to relearn previously learned skills." [R. at 549].

On March 22, 2019, the School District created an "Evaluation Report" that described a number of intelligence assessments performed with A.R. in February and March 2019. [R. at 566]. The Evaluation Report demonstrates that on February 26, 2019, the School District's education specialist, Michelle McGuire, evaluated A.R. "to measure [her] general intellectual functioning." [R. at 568]. Ms. McGuire reported that A.R.'s verbal comprehension index was in the fourteenth percentile, or "low average." [*Id.*]. Furthermore, Ms. McGuire reported that A.R.'s "full scale IQ" was in the second percentile, or "extremely low." [R. at 569]. The Evaluation Report summarized that

> [t]he results of previous evaluation[s] found that [A.R.'s] general intellectual functioning was in the Below Average range with primary needs in the areas of working memory and executive functioning, especially planning and organization, shifting attention, and short-term memory. Current assessment results confirmed these findings and found that [A.R.'s] intellectual abilities are even more impacted than previously understood with general intellectual abilities falling in the Extremely Low range. These results are consistent with [A.R.'s] achievement and academic progress and reveal that her learning is especially impacted by slow processing speed, difficulties [with] short-term memory, and challenges with visual-spatial attention and problem solving. [A.R.'s] verbal comprehension and expression are areas of relative strength, though still fall in the Low Average range of functioning.

[R. at 589]. The Evaluation Report also describes a parent interview with J.T., where J.T. represented that A.R. was struggling in the third grade, which caused A.R. stress and anxiety and which caused A.R. to pick and chew her knuckles to the point of bleeding. [R. at 580].

IEP meetings were held on March 22, 2019; April 15, 2019; and May 15, 2019, which eventually resulted in a new IEP for A.R. (the "May 2019 IEP").[7] [R. at 787–89]. J.T. was present

---

[7] The ALJ referred to "the April 15, 2019 and May 15, 2019 IEP[s]" in his decision. *See* [R. at 486]. However, the record is unclear as to whether completed IEPs were finalized at both the April

at each meeting.  [*Id.*].  At the second meeting, J.T. expressed a number of concerns with A.R.'s education and wellbeing.  Specifically, J.T. expressed that she felt like A.R. was a first grader in a third-grade classroom.  [R. at 611].  J.T. expressed that this was "too much" for A.R. and that A.R. was experiencing anxiety and depression and was being bullied.  [*Id.*].  J.T. asked if A.R. could be taken out of the general education classroom more often and requested full-time adult supervision for A.R.  [*Id.*].  J.T. also requested that A.R. be permitted to repeat third grade, a request which the School District rejected.  [*Id.*].  It also appears that placing A.R. in a multi-intensive ("MI") program was discussed and J.T. objected to this proposal, stating that it "makes her feel sick to think about [A.R.] being in an MI setting."  [R. at 748, 611].  A.R.'s IEP was modified to limit her time in the general education setting to approximately 36% of her time, with the remaining 64% of A.R.'s time spent outside of that setting.  [R. at 623–24, 759–60].

On June 3, 2019, the departing principal of Ellis Elementary sent an email to A.R.'s IEP team expressing her opinion that "[a] recommendation for retention"—i.e., repeating a grade— "for a student that has been diagnosed with an intellectual disability is contrary to most, if not all current published educational research."  [R. at 634].  She stated that her "best hope is that [A.R.] is placed in a center program that can better address all of her needs," opining that A.R. "needs differentiated instruction to address her needs as they relate to the disability with which she has been diagnosed" and that "this can only effectively happen in a center program.  [*Id.*].  However, the principal stated that "[i]f for some reason, [A.R.] is not able to attend a center program that is appropriate for her needs and she does end up returning to Ellis, I do recommend that [she] be

---

2019 and May 2019 meetings or whether the IEP team continued to work on a draft of the IEP throughout those meetings.  *See, e.g.*, [R. at 760 (April 2019 IEP meeting notes stating that additional options would be discussed at the May 2019 meeting)].

retained in the third grade to honor the family's request," though she indicated that she was "reluctant" to make this recommendation.  [*Id.*].

**Fourth Grade**.  A.R. did attend a "center program," or an MI program, at a new school—Teller Elementary—for fourth grade, beginning in the fall of 2019.  [R. at 635, 685, 962:12–14].  An IEP was developed for A.R.'s fourth-grade year, dated August 27, 2019 ("the August 2019 IEP"), which remained largely unchanged from the May 2019 IEP.  *Compare* [R. at 635–56] *with* [R. at 604–26 and 741–60].  The ALJ found that little progress had been made between the May 2019 IEP and the August 2019 IEP.  [R. at 487].  The August 2019 IEP notes that A.R. was reading at "a beginning of first-grade level."  [R. at 639].  Further, the August 2019 IEP notes that A.R.'s parents "request[ed] retention for [A.R.] for the 2019–2020 school year (4th grade).  Retention for students in non-center programs is considered by the building administration.  Students in center[-]based programs are not retained per the Board of Education policy # IKE-R."  [R. at 654].

A meeting with the IEP team was held on January 29, 2020, at which time A.R.'s IEP was modified (the "January 2020 IEP").  [R. at 679].  The January 2020 IEP includes evaluations from A.R.'s teachers, who indicated that A.R. made the following progress on her objectives: one objective met and progress made on one objective in writing, [R. at 683]; one objective met and progress made on one objective in math, [R. at 683–84]; two objectives met, one objective not met, and one objective in progress in communication, [R. at 685]; progress made on two objectives in motor skills, [R. at 685–86]; and one objective met and progress made on three objectives in social-emotional functioning.  [R. at 686].

Thereafter, J.T. requested that the School District perform an independent educational evaluation ("IEE") of A.R., to which the District agreed.  [R. at 958:9–15].  J.T. selected the evaluator—Briana Makofske, Ph.D.  [R. at 489].  Dr. Makofske evaluated A.R. on six occasions

in January and February of 2020.  [R. at 699].  Dr. Makofske evaluated A.R.'s full scale IQ score in the third percentile, or "very low" range, [R. at 730],  and diagnosed A.R. with a "mild" "intellectual disability."  [R. at 715, 720, 721].  She reported that A.R. was "consistently perform[ing] at the first-grade level" and "her growth and progress [was] inconsistent," and that A.R. needed support in the areas of academic learning, independent problem-solving, organizing thoughts, social interaction, and self-regulation.  [R. at 720–21].  Dr. Makofske asked A.R.'s special education teacher, Rebecca Cramer ("Ms. Cramer"), to complete a questionnaire for the IEE.  [R. at 704].  Ms. Cramer reported that A.R. could read independently and complete math problems at a first-grade level.  [*Id.*].  She also reported that A.R. flipped words and letters and wrote backwards and that her academic performance and progress were inconsistent depending on the day.  [R. at 704–05].

Another IEP review occurred on April 22, 2020 (the "April 2020 IEP").  [R. at 761].  The April 2020 IEP discusses Dr. Makofske's evaluation and A.R.'s progress.  [R. at 764–66].  This IEP also includes comments from J.T., wherein she expressed that A.R. is stressed "24/7" due to school.  [R. at 768].[8]  She requested that A.R. be taught at the foundational level, as opposed to the "desired instructional level."  [*Id.*].  In other words, she believed that A.R. should be taught first-grade material as opposed to fourth-grade material.  [R. at 488].  The ALJ stated in his decision that the April 2020 IEP "describes progress in the areas of reading, writing, math, self-determination, and communication," but that it was "not really clear if there was progress in the remaining two areas: motor skills and social/emotional welfare."  [R. at 489].

---

[8] The ALJ stated that these comments were made at the January 29, 2020 meeting, relying on an "Exhibit 6" in support.  [R. at 488–89].  Exhibit 6 was not admitted into evidence before the ALJ and is not part of the Administrative Record before this Court.  [R. at 492].

### III.     Procedural Background

On June 10, 2020, J.T. filed a Due Process Complaint with the Colorado Department of Education, alleging that the School District had committed a number of IDEA violations, including, *inter alia*, that the School District had failed to provide A.R. with a free appropriate public education.  [R. at 1–32].  The ALJ held a video hearing on February 22, 2021.  [R. at 483].  At the hearing, the School District moved for a directed verdict under Rule 50 of the Colorado Rules of Civil Procedure, which the ALJ granted.  [R. at 967:14–18, 968:22–24, 1011:1–19].  The ALJ issued his decision on March 1, 2021, wherein he made findings of fact and conclusions of law.  [R. at 484–91].  Specifically, the ALJ found that the evidence presented by J.T. failed to establish any procedural violations of the IDEA and that "A.R.'s IEP was reasonably calculated to enable her to receive educational benefits."  [R. at 490].  The ALJ acknowledged that A.R. "did not meet many of her goals," but concluded that the evidence "demonstrate[d] that the School District set out an appropriately ambitious [education] program with measurable goals" and "altered its IEP to better serve A.R."  [*Id.*].  Relevant here, the ALJ noted that "A.R.'s mother wanted her held back after third grade, but the School District did not do this" because "[a]s shown in [the principal's] email, . . . to do so would go against all current published educational research."  [*Id.*].  The ALJ noted that the School District had A.R. attend a center program at a new school and "placed a 40% limit on [her] time in the general education classroom."  [*Id.*].  The ALJ concluded that Plaintiff had failed to establish a violation of the IDEA.  [R. at 491].

J.T. initiated this action on May 4, 2021, [Doc. 1], and filed a First Amended Complaint on June 28, 2021.  [Doc. 17].  Plaintiff requests the following relief:

> Plaintiff respectfully requests that this Court enter judgment in her favor, reverse the ALJ's Agency Decision, enter an order directing the School District to immediately develop a proper IEP for A.R's unique needs, enter an order requiring the School District to pay for all counseling services, mental health services,

tutoring, therapy, speech-language services, and other nonacademic services until A.R. turns 21 years old, enter an order requiring the School District to pay for and implement the Brain Balance program[9] until A.R. performs at grade level and overcomes the significant regression she has experienced throughout her time in the District, and award J.T. her costs and attorney fees and such other relief as the Court deems just and proper.

[*Id.* at 19].

J.T. filed her Amended Opening Brief on June 7, 2022.  [Doc. 30].[10]  The School District responded on June 28, 2022.  [Doc. 31].  J.T. did not file a reply brief.  The matter is ripe for disposition.[11]

## STANDARD OF REVIEW

The IDEA "initially places IEP disputes under state-based administrative review."  *D.T. by & through Yasiris T. v. Cherry Creek Sch. Dist. No. 5*, 55 F.4th 1268, 1273 (10th Cir. 2022) (citing 20 U.S.C. § 1415(f)).  "Congress requires district courts to apply a modified *de novo* standard when reviewing agency disposition in the IDEA context."  *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008).  In reviewing the ALJ decision, the Court "shall receive the records of the administrative proceedings;" "shall hear additional evidence at the

---

[9] The record reflects that J.T. requested that the School District pay for A.R. to participate in the Brain Balance program.  [R. at 592; Doc. 30 at 14].  According to the ALJ, "Brain Balance . . . offers programs for students with learning disabilities."  [R. at 484].

[10] Plaintiff filed her original Opening Brief on September 1, 2021, before the Administrative Record was certified by the Office of Administrative Courts.  *See* [Doc. 21 at 2 n.1].  In response, the School District moved to dismiss Plaintiff's case under Rule 41(b) for failure to file a certified record.  [Doc. 22].  After Plaintiff submitted the certified Administrative Record, *see* [Doc. 24], Plaintiff filed a Motion for Leave to Amend Opening Brief, requesting leave of Court to amend her Opening Brief with appropriate record citations.  [Doc. 27].  Chief Judge Brimmer granted Plaintiff's motion and permitted Plaintiff to file the Amended Opening Brief.  *See* [Doc. 29].

[11] The Parties have agreed that "[t]he parties will . . . brief the issues to the Court . . ., and the Court will consider those briefs, the administrative record, and any additional evidence, if so ordered, and will base its decision on the preponderance of the record," [Doc. 19 at 2], and agreed to one round of briefing for this case.  [*Id.* at 7].

request of a party;"[12] and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Although the statute "specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings." *Garcia*, 520 F.3d at 1125 (quoting *Rowley*, 458 U.S. at 206). The ALJ's factual findings are to be given "due weight" and are presumed correct, *id.*, but legal challenges are reviewed *de novo. O'Toole By & Through O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998). Plaintiff, as the party challenging the ALJ's decision, bears the burden of proof in this matter. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

## ANALYSIS

J.T. contends that the ALJ erred in concluding that the School District offered A.R. a FAPE and "requests this Court reverse the ALJ's Decision and find the [School] District violated the IDEA." [Doc. 30 at 2, 14]. She raises two arguments in support of her request for reversal: (1) the ALJ's conclusion that the School District provided A.R. with a FAPE is contrary to the record evidence, [Doc. 30 at 10]; and (2) the ALJ's decision is unreliable because it failed to correctly consider the record evidence. [*Id.* at 12]. The Court addresses each argument below.

### I.    Whether the ALJ's Decision is Contrary to the Evidence

First, J.T. argues that the ALJ's conclusion that the School District met its obligations under the IDEA and provided A.R. with a FAPE is not supported by the record evidence. [*Id.* at 10]. J.T. does not specifically identify any particular IEP(s) that she argues failed to provide A.R. with a FAPE. *See* [*id.* at 10–12]. Rather, she posits generally that the ALJ's recognition that A.R.

---

[12] Neither Party has requested a hearing in this case. *See* [Doc. 30; Doc. 31].

"often performed poorly and did not meet many of her goals" is inconsistent with his finding that the School District did not violate the IDEA. [*Id.* at 10]. According to J.T., the School District ignored A.R.'s needs, despite having sufficient documentation of those needs, and chose "to progress A.R. through each grade, regardless of her abilities." [*Id.* at 12].

In response, the School District contends that Plaintiff "misstates the facts . . . and provides no explanation or points of law showing that the ALJ erred in his determination." [Doc. 31 at 12]. Further, the School District asserts that A.R.'s lack of progress over a short period of time does not necessarily demonstrate that the School District failed to provide a FAPE. [*Id.* at 15].

As a preliminary matter, the Court notes that Plaintiff's substantive arguments lack specificity and support, which hinders the Court's ability to conduct a meaningful and efficient review of the ALJ's decision. For example, while Plaintiff lists several circumstances that may give rise to an IDEA violation, *see* [Doc. 30 at 5–10], Plaintiff does not tie any of the cited case law to the facts of this case and does not clearly articulate why she believes the School District violated the IDEA. *See* [*id.* at 10–12]. Indeed, Plaintiff cites to essentially no legal authority throughout her substantive arguments, and while Plaintiff recounts the record generally, she does not specifically cite any record evidence in conjunction with her legal arguments. *See* [*id.* at 10–13]. The Court is not obligated to perform legal research on behalf of Plaintiff or sift through the voluminous record to find support for her arguments. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (explaining that courts "have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for [her]."); *McGowan v. Bd. of Trustees for Metro. State Univ. of Denver*, 114 F. Supp. 3d 1129, 1142 (D. Colo. 2015) ("The Court has no obligation to scour the

record in search of evidence to support Plaintiff's claims."), *aff'd*, 645 F. App'x 667 (10th Cir. 2016).  With these principles in mind, the Court turns to Plaintiff's arguments.

First, Plaintiff appears to argue as a general matter that the ALJ's conclusion that the School District provided A.R. with a FAPE is not supported by the record evidence because it is inconsistent with the ALJ's acknowledgment that A.R. "often performed poorly and did not meet many of her goals."  [R. at 490]; *see also* [Doc. 30 at 10, 12].  Insofar as J.T. argues that the School District necessarily failed to provide A.R. a FAPE because A.R. made insufficient progress from second to fourth grade, such an argument misstates the applicable IDEA standard.

A court's review under the IDEA concerns "not whether the IEP will *guarantee* some educational benefit, but whether it [was] reasonably calculated to do so." *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (emphasis added).  The adequacy of an IEP "can only be determined as of the time it is offered to the student," not with the benefit of hindsight.  *Id.*  Indeed, courts have "warned against engaging in a retrospective analysis of academic achievement in determining the appropriateness of an IEP" because "unfortunately, it cannot always be reasonably expected that progress will occur in such a lock-step manner when a child is suffering from a learning disability."  *K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, No. CV 16-0165, 2017 WL 3838653, at *11 (E.D. Pa. Sept. 1, 2017), *aff'd*, 904 F.3d 248 (3d Cir. 2018); *see also Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995) (agreeing that it would be "unfair to adopt a rule under which a [school] district would be . . . penalized for an IEP that, while apparently appropriate at the time it was developed, turned out in hindsight to be inadequate" (alteration marks changed)).

Thus, "it cannot be determined whether an IEP was appropriate solely by evaluating a child's progress or lack of progress under [an] IEP." *Colonial Sch. Dist. v. G.K. by & through*

*A.K.*, No. CV 17-3377, 2018 WL 2010915, at *11 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019). Insofar as J.T. argues generally that the School District failed to provide A.R. a FAPE because A.R. did not make sufficient progress on her various goals, the Court is respectfully unpersuaded by this argument. *See Colonial Sch. Dist. v. N.S.*, No. CV 19-1311, 2020 WL 1517562, at *13 n.24 (E.D. Pa. Mar. 30, 2020) ("[T]he parents inappropriately focus on [the student's] failure to make meaningful educational progress, particularly her failure to advance with her grade-level and meet IEP goals, instead of focusing on whether [the school] failed to appropriately revise its programs to meet [the student's] needs.").

Turning to J.T.'s more specific arguments, J.T. notes that despite A.R.'s struggles, the School District "reduced A.R.'s amount of time in special education between second and third grade." [Doc. 30 at 11]. The Court construes this portion of Plaintiff's Opening Brief as a challenge to A.R.'s 2018 IEP, wherein the decision to increase A.R.'s general classroom time was made. [R. at 553]. J.T. asserts that despite her request for an increase in A.R.'s special-education time, the School District denied her request. [Doc. 30 at 11]. According to J.T., the School District "should have addressed [her] concerns[] because A.R. was unable to gain any meaningful benefit from the general education classroom," and A.R. was "entitled to spend[] more time in the special education classroom, where she could learn appropriate lessons at an appropriate pace." [*Id.*]. The Court respectfully disagrees.

J.T. is correct that the School District amended A.R.'s IEP between the second and third grades to increase her time spent in the general education classroom from 48% of her school time to 66% of her school time. [R. at 525, 553]. J.T. testified that she was concerned with this increase and requested that this change not be made, but the School District did not accommodate her

request.  [R. at 873:13–19].  In developing the 2018 IEP, the School District considered J.T.'s proposal to reduce A.R.'s general education time and explained its decision to reject that proposal:

> It was considered to increase [A.R.'s] time outside of the general classroom to focus on academic skills.  This was rejected because [A.R.] benefits significantly from the behavior and academic model of her peers.  At this time, she has demonstrated growth using the current setting code and would benefit from continued inclusion in the general classroom.  [A.R.] needs to continue to be pulled out of the general education classroom for small group instruction.

[R. at 553]; *see also* 20 U.S.C. § 1414(d)(1)(A) (requiring that a school district provide in the IEP "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class").

With respect to the 2018 IEP's reference to A.R.'s growth, the record reflects that A.R. did make some progress during second grade.  Specifically, the 2017 IEP listed objectives for A.R.'s progress in reading, mathematics, self-determination, language, and physical motor skills.  [R. at 515–20].  Progress reports throughout A.R.'s second grade year indicate that A.R. met her goals in mathematics, [R. at 529–30], made progress on her goals in self-determination, [R. at 531–32], and made progress on her language and physical motor goals.  [R. at 533–35].  A.R. met some of her goals in reading and made progress on others.  [R. at 527–29, 535–37].

J.T. does not meaningfully explain why the 2018 IEP was not "reasonably calculated to enable [A.R.] to make progress appropriate in light of [her] circumstances" or was not "appropriately ambitious" for A.R.  *Endrew F.*, 580 U.S. at 399, 402–03; *see also generally* [Doc. 30 at 11].  At best, she mentions that A.R. scored in the single percentiles for reading, text fluency, vocabulary, comprehension, and spelling at the beginning of her third-grade year.  [*Id.*]; *see also* [R. at 542].  But J.T. does not explain why, based on these test scores, the 2018 IEP and the corresponding moderate increase in A.R.'s general education time was not appropriately ambitious in light of A.R.'s circumstances, in light of the noted growth in A.R.'s second-grade year and the

recognized benefits arising from A.R. spending time in the general education setting.  *See* [Doc. 30 at 11].[13]  Accordingly, the Court is not persuaded that the School District failed to provide A.R. a FAPE simply because it increased her time in the general education setting for her third-grade year despite A.R.'s test scores.  *Cf. C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-cv-9950 (KMK), 2018 WL 1627262, at *15 (S.D.N.Y. Mar. 30, 2018) (rejecting argument that an IEP was inadequate because it failed to include more intensive interventions where the plaintiff failed to explain why the student's low test scores, alone, required more interventions).  Similarly, insofar as Plaintiff suggests that A.R. should have received outside services from Brain Balance, this Court notes, as the ALJ did, that A.R. was only evaluated by Brain Balance; she did not participate in the program, and there is no evidence that the Brain Balance evaluation or program is scientifically valid.  [R. 490].  Indeed, although Plaintiff requests that the School District pay for the Brain Balance program in the Conclusion of her Opening Brief, Plaintiff does not address the ALJ's finding or provide any additional information or support for the validity of the Brain Balance program throughout her Brief.  *See generally* [Doc. 30].  While J.T. may have preferred that the 2018 IEP provide A.R. with more special education time, or that A.R. receive outside services from Brain Balance, the Court's review is limited to whether the IEP is reasonable, not whether it is ideal.  *Endrew F.*, 580 U.S. at 399.

The Court is further persuaded by the School District's argument that the 2018 IEP reflects the School District's attempt to educate A.R. in the least restrictive environment.  *See* [Doc. 31 at 12–15].  As mentioned above, the IDEA mandates that children be educated in the least restrictive environment, which requires that children be "educated in regular classrooms to the maximum

---

[13] While J.T. testified at the hearing that A.R.'s progress "started going downhill" after the winter break due to a teacher change, [R. at 850:16–24], J.T. does not rely upon this apparent setback in A.R.'s progress in her Opening Brief.  [Doc. 30 at 10–12].

extent appropriate." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004) (citing 20 U.S.C. § 1412(a)(5)(A)).   This requirement ensures that children with disabilities will be removed from the general education setting "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).  "Educating children in the least restrictive environment in which they can receive an appropriate education is one of the IDEA's most important substantive requirements."  *L.B.*, 379 F.3d at 976.

As explained above, the Court reviews the adequacy of an IEP at the "time it is offered to the student" to determine whether it was "reasonably calculated" to provide the student an educational benefit and to permit the student to make appropriate progress.  *Endrew F.*, 580 U.S. at 399; *Thompson*, 540 F.3d at 1149.  While the increase in A.R.'s general education time may not have ultimately proved successful, the Court may not rely on any regression in A.R.'s third grade year to determine the appropriateness of the 2018 IEP.  The record reflects that the School District determined, based on progress made by A.R. during the second grade and the benefits A.R. would receive from time in the general education setting, that an increase in A.R.'s general education time was appropriate.  [R. at 553].  Because Plaintiff has not explained why, or cited any evidence demonstrating, the School District's decision to increase A.R.'s general education time—at the time the decision was made—was not reasonably calculated to permit A.R. to make appropriate progress, Plaintiff has not met her burden of establishing an IDEA violation on this basis.[14]

_____

[14] Plaintiff cites "*Cincinnati Public School District*, 6 ECLPR 62 (SEA OH 2008), *aff'd*, *Board of Education of the City School District of the City of Cincinnati v. Wilhelmy*, 54 IDELR 58 (S.D. Ohio 2009)" in support of her argument that the School District violated the IDEA.  *See* [Doc. 30 at 7, 11].  Plaintiff did not provide a copy of this opinion with her Opening Brief, and the Court was unable to locate this opinion in any online reporters.  In any event, Plaintiff cites this case for the proposition that "[i]f the child's placement does not provide a meaningful benefit to the student and a more restrictive program is likely to provide such benefit, the child is entitled to be placed

Next, J.T. states that although the School District knew of A.R.'s lack of progress, the School District "[chose] to progress [A.R.] through each grade, regardless of her abilities."  [Doc. 30 at 12]; *see also* [*id.* at 11 ("A.R. very clearly failed to make progress, despite the School [District] progressing her through each grade.")].  The Court construes Plaintiff's brief as asserting an argument that the School District failed to provide A.R. a FAPE because it refused J.T.'s request to permit A.R. to repeat third grade.  J.T. does not identify any specific IEP she believes was deficient under the IDEA, but notes that "[i]n A.R.'s next IEP meeting," i.e., an IEP meeting in the spring of 2019[15]—J.T. raised concerns about A.R. being in too advanced of an educational setting.  [*Id.* at 11].  The April 2019 IEP meeting notes further reflect that A.R.'s parents were "interested in retention" and that J.T. "[did] not want [A.R.] progressing to [fourth grade]."  [R. at 611].

Insofar as Plaintiff suggests that A.R.'s lack of grade-level academic progress demonstrates that the School District failed to provide A.R. a FAPE when it declined to have A.R. repeat third grade, the Court respectfully disagrees.  "Performing at grade level is not a reasonable expectation for all students, and the IDEA does not require it when the student's characteristics make such a goal inappropriate."  *A.M. v. Wallingford-Swarthmore Sch. Dist.*, No. 21-cv-1926, 2022 WL 4369962, at *8 (E.D. Pa. Sept. 21, 2022).  Notably, "[b]ecause [A.R.] was not fully integrated into

---

in that more restrictive program."  [*Id.* at 7].  But Plaintiff does not cite to any evidence showing, or meaningfully argue, that it was clear at the time of the 2018 IEP that placing A.R. in a general classroom for 66% of the time was not reasonably calculated to provide a meaningful benefit to A.R. and a more restrictive setting was likely to provide that benefit.  *See* [*id.*].

[15] Plaintiff refers to the "next IEP meeting," which could refer to the IEP meeting held in March 2019.  *See* [R. at 787 (reflecting a meeting held on March 22, 2019)].  But the record suggests that J.T. voiced these concerns at the April 15, 2019 meeting.  *See* [R. at 611 (reflecting "Parent . . . input from 4/15/19")]; *but also see* [R. at 768 (reflecting that J.T. voiced these concerns or similar concerns at the May 15, 2019 meeting)].  The exact date on which J.T. voiced these concerns is not material to the Court's review.

the general classroom, . . . [it is not] proper to assume that [A.R.] should have advanced to the next grade level on the same timetable as her peers." *Rosaria M. v. Madison City Bd. of Educ.*, 325 F.R.D. 429, 448 (N.D. Ala. 2018).  The IDEA does not guarantee a particular educational outcome, *Endrew F.*, 580 U.S. at 398, and Plaintiff cites no legal authority holding that a student's below-grade-level academic performance, coupled with the School District's continuation of the student to the next grade, necessarily amounts to an IDEA violation.  *See* [Doc. 30].  The Court is not persuaded that the fact that A.R. was performing below grade level, by itself, demonstrates that the School District failed to provide A.R. with a FAPE by declining to retain her in third grade.

Moreover, J.T. cites to no record evidence demonstrating that only an IEP that retained Plaintiff in third grade would be reasonably calculated to permit A.R. to make appropriate academic progress.  In fact, the record evidence suggests the opposite; the Ellis principal informed the IEP team, including J.T., that "[a] recommendation for retention for a student that has been diagnosed with an intellectual disability is contrary to most, if not all current published educational research."  [R. at 634].  She stated that her "best hope" was that A.R. would receive "differentiated instruction to address [A.R.'s] needs as they relate to [her] disability" and that she believed "this [could] only effectively happen in a center program."  [*Id.*].  The Court must afford deference to this opinion.  *See Endrew F.*, 580 U.S. at 403.

Furthermore, the Court also notes that at the April 2019 IEP meeting, in addition to requesting that A.R. repeat third grade, J.T. requested that A.R. be taken out of the general education classroom more often.  [R. at 611].  The School District agreed with this request, reducing A.R.'s time in the general education setting to 36% of her time in school for her fourth-grade year.  [R. at 623–24, 759–60].  The May 2019 IEP explains:

> [A.R.] presently receives services at a placement level that leaves her within her general education classroom for 40 to 79% of the school day.  Over this school

year, this has proved to be not a sufficiently restrictive setting for [A.R.]. She has demonstrated minimal academic progress, as well as diminished social-emotional functioning as evidenced by increased anxiety. Advantages of a more restrictive setting are that it will provide [A.R.] with increased opportunities to receive targeted small-group or one-on-one support outside of her general education classroom. Disadvantages are that this will restrict [A.R.'s] access to her age-level peers, as well as her exposure to general education content and curriculum. The team determined that at this time, [A.R.] becomes overwhelmed and frustrated by general education academics and receives minimal benefit from participating in general education academics. [A.R.] has also demonstrated a need for increased academic and social-emotional service time, as she has made limited progress in these areas. Therefore, the team determined that [A.R.] would receive the most appropriate education by spending more than 60% of the day receiving special education services from a special education teacher or related service provider.

[R. at 623–24].

In summary, the record evidence shows that after reviewing A.R.'s third grade performance, the School District made adjustments to A.R.'s IEP to (1) include more special education instruction after considering the benefits and disadvantages of further restricting A.R.'s general education classroom time and (2) place A.R. in a center-based program. Although J.T. disagrees with the School District's decision to not retain A.R. in the third grade, she does not argue that the School District's decision to place A.R. in a center-based school and increasing A.R.'s special education time was not reasonably calculated to permit A.R. to make appropriate progress or was not appropriately ambitious for A.R. *See* [Doc. 30]. Nor does she cite any record evidence demonstrating that repeating third grade was necessary for A.R., particularly when there were less-restrictive alternative options considered and implemented. *See* [*id.*]; *cf. Banwart v. Cedar Falls Cmty. Sch. Dist.*, 489 F. Supp. 3d 846, 863 (N.D. Iowa 2020) (denying parents' request for reimbursement for residential placement costs where there was "no evidence that a residential placement was educationally necessary at that time, especially when the parties had not yet tried a less restrictive option that had been repeatedly recommended"). Again, the Court's review of the IEP is limited to whether the IEP was reasonable, not whether it was ideal, *Endrew F.*, 580 U.S. at

399, and Plaintiff bears the burden of providing sufficient argument and citations to evidence to demonstrate an IDEA violation. *Schaffer*, 546 U.S. at 62.

The Court appreciates J.T.'s desire to ensure A.R.'s opportunity to obtain an appropriate education and make appropriate educational progress. But the Court cannot substitute its own judgment "for those of the school authorities which [it] review[s]." *Endrew F.*, 580 U.S. at 404. Because Plaintiff has not demonstrated that the School District, at the time it implemented any of the IEPs at issue in this case, failed to offer an IEP that was appropriately ambitious in light of A.R.'s circumstances, Plaintiff has not demonstrated that the School District failed to provide A.R. a FAPE.

## II.    Whether the ALJ Erred in Considering the Record Evidence

Next, Plaintiff argues that the ALJ's decision is not reliable because the ALJ considered the evidence incorrectly. [Doc. 30 at 12]. Plaintiff challenges two specific, related colloquies that occurred at the hearing. [*Id.* at 12–13]. In the first exchange, the ALJ asks defense counsel about the reading objectives in A.R.'s 2018 IEP, which states:

> Measurable Goal: . . .
>> Within one year, [A.R.] will increase her reading level from a middle first grade to an end of second grade level.
>
> Objectives: . . .
>> Within one year, [A.R.] will increase her reading level from a middle first grade to a beginning second grade level.
>>
>> Within one year, [A.R.] will increase her reading level from a middle first grade to a middle second grade level.

[R. at 544–45]. The ALJ asked defense counsel to clarify these objectives at the hearing:

> ALJ: The objectives on part of page 8 [in the 2018 IEP] – on the top of page 8[.] Counsel, middle [first] grade, beginning [second] grade level[,] it seems like – isn't it the same goal? I don't understand. Aren't they a little contradictory?

Defense counsel:  Well, no, Your Honor. . . .  [I]f you look at the first objective, within one year [A.R.] will increase her reading level from middle of [first] grade to beginning of [second] grade; and then the second objective within one year, [A.R.] will increase her reading level from middle of [first] grade to the middle of [second] grade.  So it's increasing the target as the school year goes along.

. . .

ALJ: [I]t seems to say three different things as far as the final goal, you know, all to be accomplished within one year.  And just explain that to me a little bit.  I mean, the ultimate goal sounds like was to get to the end of [second] grade level.  Why are they split up like this into three separate goals?

Defense counsel: Yeah, Your Honor.  So the IDEA requires that when students have more impacted needs, that the goals be broken down into achievable objectives.  And so a lot of these are meant to be worked in due time.  And so what you'll see as you'll go through some of these objectives is that there's a progression to each of them, that we meet one skill and then we work towards another skill.

ALJ: Okay.

Defense counsel: And so for the goal that you're analyzing right now, the first step to that would be [to] get through the beginning of the [second] grade level, and then the final step within one year is to get to the middle of [second] grade.

ALJ: Okay.

[R. at 979:7–22, 980:13–981:10].  Later in the hearing, the ALJ and Plaintiff's counsel had the

following exchange:

Plaintiff's counsel: [W]hen we were going over [the 2018] IEP, when we were talking about those objectives when there was some confusion about the reading objectives, because again, as Your Honor pointed out, there[] [are] some contradictions there.  Now, [defense counsel] explains . . .

ALJ: Well, I understand it now, right?  I mean, these are – these are points on the road that she's going to – and [it] just sort of bridge[s] it in a funny way that – well, to me it seems funny.  Maybe people in education understand this.  But that these are progressive goals that we're working toward, right?

Plaintiff's counsel: Well, I understand that that's what [defense counsel's] explanation was.  However, we haven't heard from an educator what those objectives were.  I think it's important we hear about that.  Because, again, as a parent or a layperson, you look at those objectives, and those don't make a whole lot of sense.  And again –

> ALJ:  Well, it does make sense.  In light of what [defense counsel] tells us, I mean, that does make sense that why else would you put three separate goals increasingly advanced?
>
> Plaintiff's counsel:   Well, I think it's not consistent with the rest of IEPs specifically.  This is just the one objective I'm looking at.
>
> ALJ:  It's a minor point, right.
>
> Plaintiff's counsel: Yeah.

[R. at 1006:17–1007:21].

In her brief, J.T. asserts that "[r]ather than require an educator or witness from the [School] District to clarify any confusion the ALJ was having in reviewing [the 2018] IEP, particularly the language and wording of one of A.R.'s stated goals, the ALJ relied on the explanation of the [School] District's legal counsel."  [Doc. 30 at 13].  While J.T. suggests this was erroneous, she does not explain why, nor does J.T. contend that these exchanges had any material impact on the ALJ's decision or his findings of fact.  *See* [*id.*].[16]  Moreover, Plaintiff does not argue that the ALJ's understanding of the 2018 IEP objectives or goals, even if informed by defense counsel's clarification, was incorrect.  *See* [*id.* at 12–14].[17]  And finally, Plaintiff does not suggest that the ALJ's reliance on defense counsel's clarification, even if erroneous, has any impact on the legal

---

[16] While Plaintiff's counsel appeared to challenge the 2018 IEP objectives in the hearing, *see, e.g.*, [R. at 1006:15–22], Plaintiff does not challenge the objectives in her Opening Brief.  *See generally* [Doc. 30 at 12–14].

[17] Based on the Court's independent review of the 2018 IEP, and absent any substantive argument from Plaintiff, the Court notes that the ALJ's understanding of the objectives appears to be accurate and notes that the measurable-step format of the objectives is consistent with other goals in A.R.'s various IEPs throughout the years.  *See, e.g.*, [R. at 639 (the August 2019 IEP listing A.R.'s mathematics goal as "solving addition and subtraction problems with borrowing and carry over up to 999 with at least 80% accuracy," with corresponding benchmarks of solving "problems with borrowing and carry over up to 99 with at least 50% accuracy" and solving problems "with borrowing and carry over up to 999 with at least 60% accuracy")]; *see also* [R. at 645].

issue in this case: whether the School District denied A.R. a FAPE under the IDEA.  In sum, Plaintiff has not carried her burden of demonstrating any error here.

For the reasons set forth above, the Court concludes that Plaintiff has not met her burden of demonstrating that the School District failed to provide A.R. with a FAPE.  Because Plaintiff has not established any violation of the IDEA, the Court will affirm the ALJ's decision.

**CONCLUSION**

The decision of the ALJ is respectfully **AFFIRMED**.


DATED:  January 30, 2023                              BY THE COURT:

                                                    _____
                                                    Nina Y. Wang
                                                    United States District Judge